UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SARAH B. NIXON, | ) |
| Plaintiff, | ) |
| v. | ) No. 4:09CV1896 HEA |
| ENTERPRISE CAR SALES CO., | ) |
| Defendant. | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before this Court on Plainitff, Sarah Nixon's ("Nixon") motion for partial summary judgment. Defendant, Enterprise Car Sales Company ("Enterprise") has filed a response in opposition. Enterprise has filed its motion for summary judgment. Nixon has in turn filed a response in opposition. Nixon, filed suit against Enterprise for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* (Count I) and Missouri Merchandising Practices Act ("MPA"), § RSMO 407.010, *et seq.* (Count II). Enterprise has filed counterclaims, alleging breach of contract and negligent misrepresentation. For the reasons set forth below, the Court will grant Enterprise's Motion for Summary Judgment [Doc# 62]. Nixon's Motion for Partial Summary Judgment [Doc# 57] is denied.

## Facts and Background

On February 10, 2009, Nixon, a St. Louis County resident, submitted a credit application ("Credit Application") to Enterprise, a Missouri company engaged in the business of selling automobiles, requesting Enterprise to try to secure credit for her purchase of a 2008 Pontiac Grand Prix (the "Vehicle"). Nixon testified that she did not read the Credit Application before filling it out and executing. She further testified that the decision not to read the Credit Application was "solely [her] own" and she was not "pushed into that by anybody." Depo. Tr. of S. Nixon, Ex. A, at 33:1-5. On February 13, 2009, an Enterprise employee called Nixon and told her she could come in and pick up the car. Plaintiff contends that they purchased the car on this day, February 13, 2009. At this time, she executed a Vehicle Buyer's Order ("VBO"). The VBO specified a total selling price of $13,657, less a downpayment of $500, for a balance settlement of $13,147. Nixon also executed a Conditional Deliver Agreement ("CDA") and a Retail Installment Contract ("RIC"). The RIC stated the financed amount of $13,147, the finance charge, the annual percentage rate, and the total of payments that would be required. It also specified that monthly payments of $381.92 were due by the thirtieth (30th) day of each month, starting on March 30, 2009, and ending on March 2, 2014. Additionally, the RIC included an assignment clause and designated CitiFinancial Auto ("Citi") as the proposed assignee. Citi is a

former defendant in this case. Nixon testified that she did not read the VBO, CDA, or RIC before filling them out and executing.  She further testified that the decision not to read the VBO, CDA or RIC was "solely [her] own" and she was not "pushed into that by anybody." Depo. Tr. of S. Nixon, Ex. A, at 33:1-5.

After Nixon took possession of the Vehicle, Enterprise and Citi discovered an issue with the financial information supplied by Nixon.  Enterprise contends that Nixon could not provide documentation substantiating the $3,900 in gross monthly income Nixon listed in the Credit Application.  They allege that its representatives explained to Nixon that she needed to provide the documentation required by Citi's conditional approval.  As such, Enterprise states that because Nixon could not substantiate the income she listed in the Credit Application, Citi would not accept the assignment and fund the deal.  Enterprise contends that–due to Citi's rejection of the assignment– it notified Nixon that it would try to secure new financing based on the income she could substantiate.  To do so, Enterprise pulled Nixon's credit report for a second time on March 27, 2009.

Nixon now contends that she used her pay stubs and child support order in substantiating her reported gross monthly income.  Nixon argues that she was actually approved for financing on that February 13, 2009 date, and that the approval was not conditional.  Nixon alleges that Enterprise failed to obtain her

3

permission prior to obtaining her consumer report a second time. In April of 2009, Enterprise instructed Nixon to return the Vehicle because she had not been approved for financing. Nixon refused to return the vehicle and was making payments to Enterprise, which Enterprise accepted. As of March 2011, Nixon was late on eleven (11) separate payments.

## Standard of Review

The standard for summary judgment is well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Littrell*, 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'" *United of Omaha Life Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)); "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)." *Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990.

To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995). "The mere existence of a scintilla of

5

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005). Summary Judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Samuels v. Kansas City Mo. Sch. Dist.,* 437 F.3d 797, 801 (8th Cir. 2006). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526-7(8th Cir. 2007). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines,* 2008 WL 2609197, 3 (8th Cir. 2008).

## Discussion

### *Nixon's Count I - Enterprise's Violation of the FCRA*

Nixon alleges in Count I of her Amended Complaint that on or about March 27, 2009, Enterprise obtained a copy of Nixon's credit report in violation of the FCRA, 15 U.S.C. § 1681b(f). Nixon contends that Enterprise obtained Nixon's

credit score under false pretenses, and/or knowingly obtained the report without a permissible purpose, in violation of 15 U.S.C. § 1681q.  Enterprise argues that summary judgment on Nixon's FCRA claim (Count I) is warranted because Enterprise possessed at least one permissible purpose, if not multiple permissible purposes, to access Nixon's credit report.

The FCRA was enacted by Congress to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.  See 15 U.S.C. § 1681.  Among other things, the FCRA sets out certain permissible purposes for which a party may furnish credit reports to lenders. Under §1681b(f), "[a] person shall not use or obtain a consumer report for any purpose unless ... the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section." In order to establish a violation of the FCRA for obtaining a credit report without a legitimate business need, plaintiff must prove that (1) there was a consumer report; (2) defendant used or obtained it; (3) defendant did so without a permissible statutory purpose; and (4) defendant was negligent or willful in so doing. *Phillips v. Grendahl,* 312 F.3d 357, 364 (8th Cir.2002), *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007).  In this case, there is no dispute regarding the first two elements:

Enterprise concedes that it obtained Nixon's consumer reports on February 10 and March 27, 2009. The issue before the Court is whether Enterprise had a permissible purpose to obtain the March 27, 2009 report and whether they were negligent or willful in doing so.

Pursuant to 15 U.S.C. § 1681b(a), there are multiple permissible statutory purposes for obtaining or using consumer reports. Plaintiff directs the Court's attention to the following permissible purposes:

> (2) In accordance with the written instructions of the consumer to whom it relates [or]
>
> (3) To a person which [a consumer reporting agency] has reason to believe–
>
>> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
>> ...
>> (F) otherwise has a legitimate business need for the information–
>>
>>> (i) in connection with a business transaction that is initiated by the consumer; or
>>>
>>> (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

*See* 15 U.S.C. § 1681b(a)(2); 1681b(a)(3)(A); 1681b(a)(3)(F)(I) and (ii)

In accordance with 15 U.S.C. § 1681b(a)(2), Enterprise alleges that it had written authorization to pull Nixon's credit report. Where a party provides written

authorization for a report, no other permissible purpose is needed.  16 C.F.R. pt. 600 App.  The Credit Application which Nixon certified on February 10, 2009 contained the following clause:

> I, the undersigned (1) make the above representations, which are certified correct, for the purpose of securing credit; (2) authorize financial institutions to obtain consumer credit reports on me periodically and to gather employment history as they consider necessary and appropriate; (3) authorize your affiliates to obtain consumer credit reports on me; (4) authorize financial institutions, affiliates, and others to exchange credit, account and financial information about me; and (5) understand that the creditor or any financial institution to whom this application is submitted will retain this application whether or not it is approved, and that it is my responsibility to notify the creditor of any changes of name, address, or employment.

Def. Exh. B.

Additionally, Nixon executed the VBO on February 13, 2009, the date in which she maintains that she purchased the vehicle.  The VBO contains the following language:

> If Buyer requires financing for all or part of the Vehicle's purchase price, Buyers purchase of the Vehicle shall not be completed, and title to the Vehicle shall not pass to Buyer, until Buyer has completed all documents necessary to apply for and consummate the financing and the financing has been approved by a financial institution.  Buyer agrees that he/she will, before or at the time of delivery of the Vehicle, execute and deliver to Seller such other agreements, documents, and instruments as Seller may required to apply for and consummate the financing.

9

Def. Exh. D, Paragraph 3 of the "ADDITIONAL TERMS AND CONDITIONS."

> If Buyers purchase of the Vehicle has not been consummated either because Buyer financing has not yet been approved by a financial institution or because Seller has not yet received collected funds for any part of the purchase price for the Vehicle which Buyer paid by check. Buyer acknowledges and agrees that, if this Contract shows a Trade-In, Seller has the right to sell or otherwise dispose of the Trade-In before the consummation of Buyers purchase of the Vehicle. . .

Def. Exh. D, Paragraph 6 of the "ADDITIONAL TERMS AND CONDITIONS."

By both Nixon and Enterprise's account, the first credit pull on February 10, 2009 was made in connection with the initial attempt to get Nixon financing for the Vehicle. Nixon maintains, however, that the transaction was finalized on that date and Enterprise had no further need to obtain Nixon's credit report. The facts in this case indicate the contrary. On February 13, 2009, Nixon also executed a CDA, which specifically states that it is related to and made part of the VBO signed on the same date. The CDA states the following:

> I (the Buyer) acknowledge that I am obligated to buy the Vehicle upon and subject to the terms and conditions in the Order and that my purchase of the Vehicle has not yet been completed because one of the following conditions has not been met: (1) you (the dealer) have not yet received collected funds for the part of the Vehicle's purchase price which was paid by me by check; or (2) I have executed a retail installment sales agreement and you have not yet found a financial institution willing to purchase such retail installment contract from you.
> . . .

> I understand and agree that the sale of the Vehicle will not be completed until the applicable condition has been met. I have requested that you allow me to have possession and use of the Vehicle until the purchase is complete.
> . . .
> You may revoke my right to have possession and use of the Vehicle at any time before completion of the purchase by demanding the return of the Vehicle from me. Upon such demand, I shall immediately return the Vehicle to you in the same condition as when I received it, normal wear and tear excepted. . .
> . . .
> This Agreement is by this reference incorporated into and made part of the Order and any financing and related documents that I have signed in connection with this purchase of the Vehicle. If, however, such documents are rescinded because one of the conditions listed above occurs, the terms of this Agreement will no longer be so incorporated and will survive such rescission.

Def. Exh. E.

On February 13, 2009, Nixon executed the RIC, which was "retail installment contract" referenced in the CDA. The "Default" provision of the RIC states the following:

> You will be in default on this Contract if any one of the following occurs (except as prohibited by law):
>
> A. You fail to perform any obligation that you have undertaken in this Contract.
>
> B. We, in good faith, believe that you cannot, or will not pay or perform the obligations that you have agreed to in this contract.

11

It is clear to the Court that under the plain meaning of the aforementioned agreements, the transaction between the parties was not finalized on either the February 10th or 13th of 2009. Upon review of the language contained in the Credit Application, VBO, CDA and RIC, it is clear that Enterprise retained written authorization to run multiple credit reports, if necessary, in order to obtain third party financing for the Vehicle. Enterprise did so in an effort to facilitate a transaction that would benefit both parties, not just itself. The language of the aforementioned agreements is very clear in stating that the completion of the transaction hinges on setting up proper financing for Nixon. Based on the uncontested facts, Nixon was unable to substantiate the financing, which played a significant role in this case becoming what it is today. Nixon listed a gross monthly income from employment of $3,900. Aside from her gross monthly income, she listed a monthly child support payment of $177. While Nixon maintains that she provided pay stubs and the child support order to substantiate the $3,900 per month figure, she also testified in deposition that she did not know what pay stubs she could have consulted when she submitted her Credit Application. She further testified that she has never made $46,800 in a year, which is what $3,900 per month equates to. Furthermore, Danette Burse, Enterprises's

Assistant Car Sales Manager, testified that Nixon was unable to ever provide documentation substantiating Nixon's purported $3,900 gross monthly income.

Both the February and March credit pulls were made in connection with getting Nixon financing, as Enterprise was unable to secure Citi's financing after Nixon failed to substantiate her purported income.  Enterprise was permitted to do so under the plain meaning of the Credit Application, VBO, CDA and RIC discussed above.  In executing the CDA, Nixon specifically acknowledged that "my purchase of the Vehicle has not yet been completed because . . . I have executed a retail installment sales agreement and [Enterprise] [has] not yet found a financial institution willing to purchase such retail installment contract from [it]. Furthermore, Nixon defaulted pursuant to the plain language contained in the RIC. She was unable to perform obligations under the agreements (i.e. she has been late on at least eleven payments to date).  Additionally, due to Nixon's failure to substantiate her income, Enterprise had good reason to believe that Nixon could not perform the obligations that she agreed to in the contract.  As such, Nixon's argument that as of February 10, 2009, Enterprise had no need to obtain Nixon's pay stubs, proof of child support income, or other similar documents fails.

In all actuality Enterprise had multiple permissible reasons to pull Nixon's credit report on March 27, 2009.  In accordance with 15 U.S.C. § 1681b(a)(2),

Enterprise had written authorization to pull Nixon's credit report.  Additionally, pursuant to § 1681b(a)(3)(F), Enterprise was authorized to obtain the credit report because they had a legitimate business need for the information (i) in connection with the transaction initiated by Nixon, and/or (ii) to review Nixon's account to determine whether she continued to meet the terms of the account.  Thus, there is no evidence of any alleged FCRA violations. Enterprise is, therefore, entitled to summary judgment on Count I of the complaint.

### *Nixon's Count II - Enterprise's Violation of the MPA*

The MPA prohibits the use of "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce.  R.S.Mo. § 407.020.  Nixon alleges that Enterprise violated the MPA by: (a) telling Nixon she had been approved for financing with Citi even though that information was false; (b) intentionally concealing from Nixon the fact that Enterprise approved Nixon's credit application on February 13, 2009; (c) falsely stating that Enterprise approved Nixon's credit application on Feburary 13, 2009; (d) requesting an unauthorized copy of Nixon's credit report in March 2009; and (e) repeatedly submitting Nixon's credit application to numerous financing companies after Citi declined to extend credit,

knowing this would cause increasing damage to her credit reputation ("MPA claims," collectively).

To succeed on a MPA claim, a plaintiff must prove: (1) the act, use or employment of; (2) a deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or a concealment, suppression or omission of a material fact; (3) occurring in connection with the sale or advertisement of any merchandise in trade or commerce; (4) resulting in an ascertainable loss of money or real or personal property; (5) occurring to a person who purchases or leases merchandise primarily for personal family or household purposes.  *See* RSMo. § 407.020, *et seq., Universal Sewing Supply, Inc.  v.  Artek Sewing Supplies, Inc.,* 2005 U.S. Dist. LEXIS 33428, *6, Case No. 4:05CV974-JCH (E.D.Mo.  Sept.  8, 2005; *Owen v.  General Motors, Corp.,* 2007 WL 1655760, *2 (W.D.Mo.  June 5, 2007).  Enterprise argues that Nixon's MPA claim fails as a matter of law for two reasons: (1) Nixon cannot show a deceptive act or omission; and (2) Nixon cannot show an ascertainable loss of money or property, a statutory requisite of a viable MPA claim.

Nixon's MPA claims (a), (b), and (c) listed above all fail for the same reason.  As stated above, and uncontested by both parties, Nixon executed the CDA, as part of the VBO, on February 13, 2009.  Nixon testified that she did not read these

documents, or any of the other documents she executed at that time. She further testified that she executed these agreements "solely [her] own" and she was not "pushed into that by anybody." Depo. Tr. of S. Nixon, Ex. A, at 33:1-5. All of these documents were executed after her alleged telephone conversation with an unknown Enterprise employee in which she was told she could pick up the vehicle. Nixon offers no factual evidence that actually substantiates this alleged phone conversation. In light of this evidence, it is clear to this Court that Nixon is bound by the agreements she entered into on February 13, 2009. The evidence before the Court very clearly shows that there was no act of deception, fraud, false pretense, false promise, misrepresentation or unfair practice, or concealed, suppressed, or omitted material fact in connection with the sale of the vehicle to Nixon. Nixon's decision to bypass reading the contracts she entered into are by no means a sufficient excuse to avoid the validity of these instruments. As such, Nixon's MPA claims (a), (b), and (c) all fail.

Nixon also contends that Enterprise violated the MPA by requesting an unauthorized copy of her credit report in March of 2009 (MPA claim (d)). As discussed above in regard to Nixon's Count I, Enterprise did not request an unauthorized copy of Nixon's credit report. As such, MPA claim (d) fails as well.

In Nixon's MPA claim (e), she maintains that Enterprise violated the MPA by repeatedly submitting her credit application to numerous finance companies after Citi declined to extend credit, knowing that each finance company would obtain a copy of her credit report and cause increasing damage to her credit reputation. Nixon offers no factual evidence that substantiates any tangible damage to her credit reputation. At most, in deposition, Plaintiff's expert testified that Nixon's credit score was "adversely impacted" by Enterprise's actions. Further testimony by Plaintiff's expert revealed he did not know her credit score prior or subsequent to the events at issue, and he conceded that there is no way to quantify these alleged damages. Furthermore, after the expert's deposition, Nixon stipulated that "she is not seeking damages for the diminished value of her credit;" she will state that merely "some amount of damage was done." Most significant; however, is–as previously discussed–the Credit Application Nixon executed authorized Enterprise to "obtain reports on [her] periodically," and "financial institutions, affiliates, and others to exchange credit, account and financial information about [her]." Def. Exh. B. The Credit Application. As such, Nixon's MPA claim (e) fails as well.

Nixon fails to show "an ascertainable loss of money or real or personal property" as required by RSMo. § 407.020, *et seq*. It is well settled that a private

17

litigant in Missouri has no cause action under the MPA unless he can show "actual damages" encompassing "an ascertainable loss" of money or property stemming from a violation of the MPA.  See RSMo.  § 407.025.1; *Craft v.  Phillip Morris Companies, Inc.,*2003 WL 23139381, *3 (Mo.Cir., 2003).  Nixon has failed to show "actual damages" here, and she has failed to show a violation under the MPA and FCRA.  As such, her claim under the MPA (Count II) fails.

## **Conclusion**

Defendant Enterprise had a permissible purpose under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq,*. to obtain the March 27, 2009 credit report, and they were not negligent or willful in doing so.  Further, Defendant Enterprise did not violate the  Missouri Merchandising Practices Act, § RSMO 407.010.  As such, summary judgment is granted on both Count I and II in favor of Enterprise.  Plaintiff Nixon's motion for partial summary judgment is now denied as moot.

Since the Court has granted summary judgment in favor of Defendant, the only remaining issues are Defendant's pending breach of contract and negligent misrepresentation counterclaims.  The parties shall submit memoranda regarding the status of this Court's jurisdiction.  Upon consideration of the memoranda, the Court will set a new trial date if necessary.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Enterprise's Motion for Summary Judgment [Doc# 62] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff Sara Nixon's Motion for Partial Summary Judgment [Doc# 57] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that the parties submit memoranda regarding the status of the Court's jurisdiction within ten [10] days of the date of this Order.

Dated this 13th day of October, 2011.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE